Thank you, Your Honor, and may it please the Court. Scott Michelman of Public Citizen for Plaintiff Appellant Lee Pele. I'd like to start with a couple of points that Mr. Clement made in the last argument. Mr. Clement said it would be remarkable for a federal court to disregard state law in terms of how it treats its agency. Mr. Pele entirely agrees with that. It would be remarkable for a federal court to come and tell Pennsylvania that having explicitly disavowed, to use the words of this Court from Oberg, having explicitly disavowed the debts of FIIA, now suddenly it's going to be on the hook for them. That would be remarkable indeed. Pennsylvania has structured this agency and functions with this agency such that FIIA has its own money and Pennsylvania's debts are not the debts of the state. Second, Mr. Clement says it's important to look at context. And I'd echo Mr. Ryan and say, yes, let's look at the context. This is a huge, multibillion-dollar, nationwide loan business affecting almost 10 million borrowers, student borrowers, students, families. And if Mr. Clement is correct, FIIA can do all of this business all over the country and not be accountable in the slightest. Third, Mr. Clement mentioned the burden. And he alluded that the burden might be a little different in our case, and it is. This Court made very clear in Hutto that it is FIIA's burden to establish its sovereign immunity as a defense. And that decision was rendered just in December, actually, after the district court ruled in this case. Turning to the legal principles that this Court has already established, in Oberg, this Court rejected sovereign immunity based on a series of legal conclusions on the one hand and factual assumptions on the other. Now, the legal conclusions are not subject to debate here. They're this Court's precedent from Oberg II. This Court's already decided what Pennsylvania law means and how to weigh the various requirements of state treasury review and the fact that the funds are formally in the state treasury but have FIIA's name on them all the way. What could change are the facts. But they have changed. The key factual conclusions on which this Court relied to reach its decision in Oberg rejecting sovereign immunity have been, in fact, confirmed in discovery. And the most important of those, what this Court called most critical to its autonomy analysis and which also played into the functional liability analysis, is the fact that FIIA is operationally independent. It does not rely on state appropriations to fund its activities. And it has been so, as Mr. Clement acknowledges, since 1988. So, with the same law, with the same facts, now proven in discovery, we should have the same result as in Oberg. No sovereign immunity. Now, on top of that, we found out in discovery that this is, as I said, a multi-billion dollar loan business that lends to millions of students nationwide. Students outside of Pennsylvania not attending Pennsylvania schools. Now, FIIA says, well, we've got to look at the state agency's mission. And we agree that its mission is concerned with Pennsylvania students. But this Court in Oberg also looked at the activities. And the activities here, unlike as the assumption went in Oberg, are clearly way beyond the bounds of Pennsylvania. In fact, a majority of the loans serviced, a majority of the loans guaranteed are out of state. And that has been true for each of the last five years. So, when you look at those three factors together, the first two are more than enough to reverse on the strength of Oberg. But the third one just tips the balance overwhelmingly against sovereign immunity. I'd like to speak in some more detail about the liability factor. There's been a lot of discussion. I won't belabor the point about legal liability, but as your Honors, several of your Honors noted, the provision of 5104.3 and 5104.8 explicitly disclaims Pennsylvania's liability for FIIA's debts. And by the way, I don't think it matters that they haven't paid a judgment. We don't know what they're going to do. We know that when FIIA has settled cases, FIIA has paid those settlements, not Pennsylvania. I think that's a much better clue than Chairman Adolph's admittedly speculative testimony about what might happen in the future if it were to pay a judgment in this case. And I don't know why in the world they would treat judgments, why the state of Pennsylvania or FIIA would treat judgments different than settlements. Either way, they are paying an obligation arising out of a case. And in the past, as FIIA's CFO, Mr. Gunther, explained in his deposition, that money came from FIIA's money. And moving further into the area of functional liability, FIIA is financially independent. And to the extent that it has oversight by the state treasurer, to the extent its money is in the state treasury, those are formalisms that this court explicitly considered and rejected in the Oberg opinion at pages 138 and 139. But don't we have more information in terms of the state's review of these contracts and exactly what kinds of things are being sent back? We've got more information as a result of this discovery, do we not? That's right, Your Honor. But as to the functional liability, there's nothing in that new information that suggests it's any less FIIA's money, that suggests Pennsylvania is on the hook any more than it was before to cover a judgment. I thought you were addressing autonomy. You haven't moved to autonomy yet? No, Your Honor. I was speaking of functional liability. You're still talking about liability. Liability. And I think, you know, and that is the most important factor, as this court has repeatedly stated. The argument that one of the quote-unquote new facts on which Mr. Clement relies is the commingling of the funds. But as was established in the last argument, those funds are earmarked. Those funds are clearly earmarked as ELAF funds. That's FIIA money. It says in the statute that it's FIIA's money. It's required by statute to be FIIA's money. And there's no way, you know, Pennsylvania can't raid that fund and build a road if it wanted to. Unlike, for instance, in the Risto case where this court's ruling depended in part on the fact that South Carolina did, in fact, withdraw money from its ports authority. And in the Hoover case as well, which is also about South Carolina, the state took money out of the review and control board at issue there. So there was a functional sense in which a judgment against the entity would actually affect the state's FISC. Here, the state's FISC is simply not at risk from any, either settlement or judgment in this case. Now, turning to Your Honor's question about- Can I ask you just one question, Mr. Mike? Yes, sir. You know, sometimes we argue concepts. First, I may be able to agree that it exists. Do you think there's such a thing as functional liability? Well, I think Mr. Ryan put it well when he said that if there is such a thing as functional liability, it has to be an inevitable impact on the state budget. I think the Hutto case is a good example. If there is functional liability, it would be a case where the law functionally makes the state do what it doesn't explicitly command. So if in spite of 5104 saying that Pennsylvania is not going to be liable for FEA's debts, if there's some other general provision of Pennsylvania law that said Pennsylvania has to cover the shortfalls of any of its agencies, then that might create functional liability in the Hutto case, but that's an arrow down. Wouldn't the commonwealth have to submit, I think he suggested hypothetically, and now hypothetically I guess it's true that if somehow FEA was hit for $75 million, that $75 million that otherwise would fund grants to Pennsylvania students going to school, wouldn't the commonwealth have to decide are we going to let those students not go to school? Are we going to pony up with our other general funds and make good? Isn't that the inevitability we talked about in functional liability? That's actually not functional liability. That's very different than in Hutto where South Carolina had to do it. South Carolina had to cover the shortfall. Here it would be voluntary choice. They could say, well, we have to pay a judgment against Mr. Pele. We're going to fund less of the grant program. That is a voluntary choice, and as the Third Circuit made clear in the Christie case to do with the Pennsylvania turnpike, voluntary choices by the legislature don't create sovereign immunity because, as the Supreme Court said in Hess, on which both Oberg and we rely, it's about losses and debts, not the potential. The core of the 11th Amendment, isn't that the kind of Hobbesian choice that states should have to make in terms of, like you said, sort of cavalierly? Well, maybe we won't fund those grants. We'll do something else, even though it's not a liability. Isn't that functionally that's really what happens when an agency like this goes down or pays? We don't think that's apples and oranges. That's not the concept you're talking about? I think that is different, Your Honor, and the reason is because the 11th Amendment is concerned with affronts to the state's treasury and dignity that are required, that are legal obligations, as the Court stressed at page 51 of the Hess case. This is about what the Commonwealth is required to do, and other than that, it can make its choices. Now, states get involved in a lot of things, and here the state has decided that it's going to get into the student loan business. With that comes responsibilities, and if in discharging those responsibilities they violate laws and are liable, then FEA is going to have to pay it. But Pennsylvania can choose what to do, and as long as it has that choice, this judgment would not be an affront to the state's dignity or its treasury. Moving on to the issue of autonomy, the financial independence was the most important factor that this Court considered in Oberg. It was confirmed in discovery here. I think it's notable that even the District Court, in our case, ruling for FEA on sovereign immunity, nonetheless found that financial independence was satisfied. We have the same balance of powers as in Oberg, a lot of them coming from FEA's organic statute, which hasn't changed, and so the balance should be struck the same way under Oberg. What about the discovery, though, the Joint Appendix 213 to 34 in particular, which really shows quite a bit of oversight, quite a bit of specific questioning. Was this transaction originally done as a competitive procurement? What is the value of Pure Flex to your agency? That's page 218. Page 221, please explain the authority for FEA to create a lien or encumbrance on a Commonwealth property. Throughout this section there's quite a bit of detail and quite a bit of questioning going on in terms of the underlying legal principles, in terms of stating the specifics of the obligations of the parties. So, again on 227, are we concerned that the personal injury language in Section 15 would constitute a waiver of the doctrine of sovereign immunity? There appears to be some pretty close scrutiny of these documents. How do you just say, well, that's just ministerial? This discovery seems to show some more hands-on concern and exercise of control by the state. There is some evidence in the record pointing against autonomy, and that was true in Oberg as well. The court, however, balanced them. The court noted specifically in Oberg, and I'm quoting now from page 139 of that opinion, state officials exercise some degree of veto power over FEA's operations. That was already before the court. The court recognized that. To some degree it is not quite the same as having this discovery in front of you with these specific questions being made. Please explain how Section, this is again on Joint Appendix 215, how does Section 11 of Exhibit A and Section 6 of Exhibit C, how will they be interpreted in the event that an actual claim shall arise? Again, this is a fairly intense level of scrutiny, isn't it, as shown by discovery, which occurred after Oberg II? There is a certain amount of scrutiny, but I think those are details of aspects of the statutory regime that were before the court in Oberg. These are essentially details of things. Right, but we didn't know how they played out in practice. I mean, don't we have something new in this material? And if not, tell me why not. Why isn't this new for our consideration? I mean, I think it's new at a granular level, but at a broad sort of overview level, we've still got the same powers of the agency. We've still got, as this court said, that fees funds shall be available to the agency, and fees board may use those funds in any manner that furthers the agency's corporate purposes, and that's this court interpreting 51043, the Pennsylvania statute. So this court has already thought hard about how this statute works. Now, in practice, there may be more or less oversight, but the agency is structured in a way so that fee is autonomous and it is, as it was before, self-funded. And I will reserve the remainder of my time. Thank you. Mr. Clement. Good morning, Your Honors. What I'd like to do, if I could, is actually go through the factors in reverse order just so I make sure I get to 4 and 3, which I haven't had a chance to talk about yet. Let me start with just one piece of context, though, which is this case is obviously a little bit different from the Oberg case. One way it's different is that Judge Kacharis, in this case, denied the agency's motion to dismiss in the first instance. And so, like this court in Oberg 2, he recognized that some of these issues are perhaps not well suited for disposition on a motion to dismiss, even in an immunity context like this. But when he assembled the discovery record, he was persuaded, even though he had denied the motion to dismiss, that summary judgment was appropriate. And I think that's because, as Judge Keenan was indicating, the record is considerably different, considerably richer, whether it's at a granular level or just adds some key facts. One of the key facts, I think, that was added, both as to the disbursement process and as to the contract review, which I don't think this court really had before it as a fact, is the fact that it's the exact same as for the other agencies. And I think that really does put it in context because I think, ultimately, the test is not, do you think they are as thorough as you would have them be as a matter of best practices? The question is, is it the same as other agencies are being treated? Let me go to, then, the fourth factor, which in this particular case, as I understand it, it's conceded in the briefs. Our friends on the other side really don't take issue, because I think they feel they can't, with the reality that Pennsylvania itself treats this entity as an arm of the state, as entitled to sovereign immunity, as exempt from taxation, and all of the like. I think that concession was well taken, but I do think that's the point where this contextual point, where we at least have surface agreement, that it would be rather unusual, and not that it's not possible. It's an ultimate federal law question. I certainly grant you that. But it is a large step for a federal court to say, especially with a statewide agency, that it is, even though the Commonwealth very much views it as a Commonwealth entity subject to that, nonetheless, the federal courts aren't going to recognize that. And so I think that that's why the fourth factor, as this court said in the stadium authority case, the Maryland Stadium Authority case, this court said that the fourth factor is very important and may be controlling. And so, you know, this court has cases that say the first factor is the most important. It has statements that say the fourth factor is very important. I think that happens when you have multi-factor tests. But I don't think that the fourth factor should be gainsay, because there's no question. It's not just early cases in the state Supreme Court. It is the continual treatment by the Commonwealth of this agency as a state agency that I think speaks volumes. I mean, if there is a dispute with the Attorney General over an opinion that the Attorney General gives, which otherwise is binding authority on the agency, the place you take that dispute is to a Commonwealth court that only has jurisdiction over state agencies. I mean, and I could go on and on, but at multi-different levels, it is clear that the state has no doubt about this. The state is quite clear this is a government agency. As Judge Keenan alluded to, the employees for this organization not only have a badge that proudly states they're a state employee, but their wages are also determined by a labor agreement that's negotiated by the governor government-wide. So they don't have their own separate bargaining unit where the board does the bargaining for their wages. That's done by the governor of the state for all state employees. So the fourth factor overwhelmingly points towards a sovereign immunity status, farm of the state status. So let me move then to the third factor. Now, the third factor, what is a little bit different in terms of the record, I will admit, is that we now have some more data on the extent to which not that the majority of the activity is out-of-state, but simply that a majority of the revenue that they're able to generate comes from out-of-state activities. Now, I think a couple of things are important. I don't think that this court meant to say in overdue that the source of the revenues had some outcome determinative factor for factor three. To the contrary, I think what this court was talking about is what matters is the purpose and the focus of the agency's activity. And is that focus in-state, or is it focused locally, or is it focused out-of-state? And here I think it is quite clear that the focus and the locus of activity remains in-state. At this point, this agency has only one employee outside of Pennsylvania. They have one employee in Washington, D.C. All of this other activity, whether it's guaranteeing a loan in Georgia or servicing a loan for the federal government, all of it takes place in Pennsylvania with Pennsylvania employees who are state employees on their badge. So the locus of the activity is entirely in-state, and the focus of it is in-state. This is not done when they do guaranteeing for Georgia at the request of the federal government. They don't open up an office in Georgia and then start providing grant aid to the Georgia government in an effort to try to get more work from Georgia. Would that make a difference? I think it might make a difference. I mean, I think, you know, if you put sort of troops on the ground, so to speak, in these other jurisdictions, and all of a sudden started having a distinct relationship with those other states and their governments, it starts to look more like a bilateral compact or something unusual. But I think when all that, you know, I mean, I just, with all due respect to the other side, I don't think it matters if they service a couple of loans in the Caribbean if they take the proceeds of that guarantee or that servicing activity and provide one more grant for a Pennsylvania resident. That just underscores that the focus on this, what matters for this idea, is that the money is plowed back into Pennsylvania education, higher education assistance for Pennsylvania. As the name of the organization suggests, that's what their focus is. It's a statewide focus and it's an in-state focus. You're saying as the name suggests, but didn't they create affiliated entities to take the name Pennsylvania out? So it isn't simply the name affiliation that you just suggested. I mean, they've created these other entities that don't say they're Pennsylvania. Yeah, and with all due respect, Your Honor, I don't think that should be outcome determinative. No, I'm not saying it doesn't. Right, I mean, you know, the State Liquor Board, which has been held to be a state, arm of the state, also when they have liquor stores, you know, it doesn't say Pennsylvania on there. It says, I think, fine wines and spirits. No, I agree, but your point was that it said Pennsylvania, and I'm saying it didn't always say Pennsylvania. The servicing activities themselves don't always say Pennsylvania. And I think that's part of it. One of the trade names they operate has got federal in the name, and they started using that when the federal government changed the rules and required that all federal loans, all loans be federal, and they'd be serviced by entities. And so they accurately said, look, we're doing federal loan servicing. But the name of the agency never changed, and its mission never changed. But I guess really the more important question, isn't it, what about the fact that they're engaged as this massive commercial enterprise? They're in competition with other commercial enterprises all over the country. I'm very glad you asked that, Judge Kena, for two reasons. One is, I thought this court actually put that to bed in OBRT 2 when they had the argument, hey, this is commercial, this is non-sovereign, and this court said, no, that doesn't matter. But equally. What about the competition? Certainly you'd have to be involved in commerce to some extent to send these loans and to service these loans. But what about the fact that they're in this competitive commercial environment? Does that make a difference? I'm not saying I know the answer. I'm asking you. I think I know the answer, and I think the answer comes actually from the college savings against Florida prepaid case from the Supreme Court. That's not an Arm of the State case, but it is an 11th Amendment case. It has to do with this pardon waiver doctrine. But the argument that the court heard there was, hey, you don't get 11th Amendment immunity for this activity because you're providing educational assistance, basically kind of like a 529-type program, in competition with a private entity, the college savings bank, which was a private entity. And the private entity sued them for trademark violation and patent violation. Now, if there's anything where you'd think that there'd be some kind of unfairness to having a sovereign entity competing against a private entity, it would be on things like whether they are infringing their patent or infringing their trademark. And the Supreme Court specifically heard the argument that it mattered that they were in a competitive private activity. And they said, again, in the context of resolving a pardon immunity question not an Arm of the State, but the Supreme Court emphatically said that does not matter. And so I just really think that's important, which is I don't think that it's any part of the four-factor test or any part of the 11th Amendment jurisprudence that comes down from the Supreme Court that somehow if you're engaged in something that looks less sovereign or you're competing against other entities, that that somehow gives you a competitive advantage. I don't think that's really part of the test. I would also just add that in a case like Hutto, you had insurance. That's certainly not something that's inherently sovereign. You could have commercial insurers that would be trying to compete with the state insurance fund in those contexts. I don't think that's something that really factors into the analysis very much. So that brings me to the second factor in the autonomy factor. We've talked about that a bit already, but I do think that, you know, as the question has underscored, this contract review, the disbursement process, that is not a pro forma process. It's actually quite an intensive process. One of the things that's one of my favorite facts about the contract review process in particular is that with this agency, as with all other agencies, one of the particular things that the Attorney General is doing in reviewing those contracts is to ensure that the contract doesn't waive the state's sovereign immunity. And that's true of FEA and it's true of the other agencies. So it's not just that they're reviewing this, they're reviewing these with the understanding that these are parts of the Commonwealth government and it's going to be important that the contract not be something that waives the sovereign immunity of the Commonwealth. So I think that underscores that the review is real, but it also underscores that in kind of reinforcing the fourth factor, that the rest of the Commonwealth government is viewing this like any other agency within the government and they're reviewing the contracts and the disbursements with that thought in mind. Let me ask you this. If FEA created a 501C foundation and it's funneled about $10 million a year to it, I believe without express legislative authority, why doesn't that show autonomy? Or how would you respond to that? Well, I would say that what that shows is that they have an ability to do some things without, you know, they have that flexibility to do that. But it is a mistake to think that they operate sort of independent of the oversight of the legislature. But it was done without express legislative authority, am I correct? That's what the record shows. I think you may be, Your Honor, but it's not something I think the other side is really focused on, so I don't have it 100% in mind at the moment. But the point is, I mean, they do a number of things without express legislative oversight, and the understanding is that it's done in furtherance of their mission, which was devised by the legislature. And contrary to what Mr. Ryan says, like other agencies, they go up there every year as part of the appropriations process. And so if somebody in the state legislature thinks that, hey, what are you doing with this particular thing? You don't have an express authority, they would have some explaining to do, and that would be part of the back-and-forth like every other agency. I just don't think with other agencies, either, that everything they do is based on an express authorization from the legislature. You know, you have a lot of things that are in sort of a gray area. You have some things you're expressly told to do, some things you're expressly prohibited from doing, and then there's a lot of gray area. And since you go up there every year as part of the appropriations process, I think— It could be within the general powers. Yeah, exactly. And if it weren't, you know, again, without pretending I have more in mind about that particular example, if it had to be executed by a contract, it seems to me as I'm standing here hard to see how you set up a 5013 without a contract, it would go through the approval process of the attorney general, and the attorney general as part of that process would have looked into the question of whether it was in furtherance of the statutory mission and would have reached some judgment that it was broadly understood. But beyond the approval aspect of that, isn't there yet another example where you represented yourself as a person? Because under the tax code, 501C status is only granted to persons, corporate persons or individuals. So then aren't you representing that you—because the federal government doesn't tax states, right? So wouldn't you then be asserting yourself as a person for 503 status? Well, I— Wouldn't you have to be? I don't think so. But if I take—I mean, I don't know. Oh, okay. But if I take your question, it may be that it was unnecessary. I mean, I'm not a tax expert. It may have been unnecessary for them to set up the 501C because, as your question suggests, but, you know, people in the tax world do all sorts of things out of an abundance of caution. But I just don't know if they have to avert the federal government that they're a person. And obviously the federal government has a distinct relationship with the states. They can sue them. So I'm just not sure that their representation of the federal government in a tax form ought to sway the analysis, particularly one way or another, with all due respect on that. So let me finish, if I could, by talking a little bit more about the first factor, just to try to get a couple of facts on the table. First of all, you know, it was suggested at one point that Mr. Adolph is just speculating, and what does he know? He's not only the chairman of the board of the agency. He is also the chairman of the House Appropriations Committee. So if anybody on the planet is in a position to speculate about the inherently speculative question about what would happen if there were a sizable judgment against FEA and would the Commonwealth come in and appropriate some funds, it would be Mr. Adolph, who, as I said, it would be, I think, probative if he were just the chairman of the board of directors of the agency. But he also happens to be, his full-time job is as the chairman of the House Appropriations Committee. So I think he's in a better position than anyone else to testify to that. As to the testimony in the record, which is new this time around, that this would clearly be paid, any judgment would be paid by a check from the Treasury based, admittedly, from the account. That's not Mr. Adolph. That's Mr. Gunther. Again, that testimony is uncontroverted, so you can quibble about the legal significance of that. But as a factual matter, this will be paid by a check cut from the Treasury. It was suggested by my worthy adversaries that there have been settlements that were paid out of FEA funds. You know, there's a little bit of wordplay that goes on here with what's FEA funds, what are state funds. As I understand it, there are settlements that were non-litigation settlements, pre-litigation settlements, were paid out of two sources. One is some of them were paid out of the M&T account that, like other agencies, allows the agency to write a check but then go through the same basic process of getting the Treasury Department approval in a reimbursement context as opposed to an initial disbursement context. So I don't think it should be outcome determinative that that settlement was paid from an M&T bank account, that you have to get retroactive approval from the Treasury as opposed from the Treasury Department. But in all events, the record is clear that a litigation judgment would be paid by the Treasury. The other instance is I think there was a tax issue with respect to the treatment of a particular bond fund. And since the tax treatment affected the bond fund and the certificate holders, the sort of tax differential was paid out of that fund. But that's a very unique situation, I think, where the difficulty was specific to the tax treatment of that particular fund. The other things I'd like to say is just to emphasize a couple of last points before I sit down. One is that, yes, there is a segregated fund here. But there was a segregated fund in Huddam, there was a segregated fund in Hoover, and there was a segregated fund in the Stadium Authority case. So this Court's cases are clear that that segregated fund is not outcome determinative, particularly with respect to this functional liability context. My friend, Mr. Michelman, raised the Christie case from the Third Circuit. The Out-of-Circuit precedent obviously has its persuasive authority, but I think it's particularly problematic to rely on Third Circuit precedent on the first factor because in the Third Circuit case laws, I understand it, they really don't have a concept of functional liability. They only have a legal liability. I think that's a point we made in our 28-J letter responses as well. So I think that's a particularly sort of bad place to rely in answering the functional liability question. On the functional liability question, a lot of emphasis has been placed on the idea that since 1988, at an operational level, the agency has not received annual appropriations. But I would say two things about that. One, you shouldn't infer from that that that means that they're immune from the budgeting process, as was suggested, because they do go up there annually. Mr. Adoff's testimony is that he goes up there annually. But also, they're not immune from the budgeting process because they get those appropriations for the grant money. So all that's happening is pre-1988, they got an appropriation for the grant money. I'm sorry, pre-1988, they got the appropriation for the grant money and a separate appropriation for operations. Since 1988, they still get that appropriation for the grant money, which they then disperse, but they don't have the operational appropriations on an ongoing basis because they've been able to operate in the black. But I don't think that creates this incredible autonomy, especially when you see that they continue to go up there annually and continue to get the grant money. And it's really the effect on that grant money, as Judge Gregory was indicating, where I think you really see the functional liability issue here in a way that's very different from the attenuated effects in Hess. Here, if this agency takes a $75 million hit, then first they're going to write a check for $75 million from the state treasury on a check that says the Commonwealth, and second, it's going to create the exact problem that the 11th Amendment is directed to, which is the state is going to have to figure out where they're going to come up with that $75 million or they're going to allow these kids to not get the grants. The last thing I want to say, just in terms of the disposition of this case, I do think this is really a legal issue. I think it was perfectly appropriate to decide it on the summary judgment record, not motion to dismiss. But I don't really think this is a factual issue that should go to the jury. I mean, I think it would be a mistake and offend the ultimate purposes of the 11th Amendment if you sent all these factual disputes to the jury. Let me ask you a quick question about that. Sure. I know you're out of time, but is the arm of the state issue or the 11th Amendment immunity issue a question for the jury? I don't think it is, Your Honor. Presuming they're issues of fact. Presuming they're issues of fact. I don't think there are. I looked into this, and I would offer you that the case law on this is not clear or directly on point, but it seems to me that this is a question that the judge has to resolve himself or herself. And if there are factual disputes that are real disputes, here I think the facts are pretty clear, and people are just drawing different legal inferences from them, so I'm not sure the issue arises squarely here. But if there really was a factual dispute, you know, if one side said in 1987 this check was drawn from the Treasury and the other side says, no, in 1987 it was drawn from an M&T account, and it's, you know, the proverbial he said, she said, I think the judge has to resolve that. I think it would be very odd to put that as a specialized interrogatory for the jury before they hear the rest of the case. I mean, again, you know, reasonable minds can differ about that, but I do think that is far and away the better view, that this is just a legal issue that the judge has to resolve before the merits of the case would go to the jury. Thank you, Your Honor. All right, reply. What do you think about that last issue, last question? Is this a question for the jury or a question for the judge? This is the one point of agreement, Your Honor. We agree with Mr. Clement. This is an issue for the judge, and it's for that reason that we're asking, Your Honors, not only to reverse the grant of summary judgment to Fiat, but to reverse the denial of summary judgment on this issue to Mr. Pele, because we think the law is clear, and let me go through the factors as well. Mr. Clement really likes factor four because that's the only one that's in his favor, but the other three do favor us, and I'd like to go back to the first one again because it has been stated over and over by this court in Oberg, in Cash, in the Maryland Stadium case, but that is the most important factor. Now, getting back to Judge Gregory's question about where would the money come from on the question of functional liability, I'll tell you where it's going to come from. It's going to come from their $1 billion in reserves that Mr. Gunther testified they had. They've got plenty of money to cover this judgment, and they've got plenty of money to keep going with their grants to students. As for the question of the legislature's choice, now, Mr. Adolph can speculate, and we've agreed that that's a speculative question, but he doesn't get to decide that on his own. He needs the rest of the legislature to vote with him on that, and even if they did, it would still be a choice. Now, as for the Third Circuit's Christie precedent, Mr. Clement says don't look at them. They don't recognize functional liability. That's actually not correct. In the Febris case in which Mr. Clement relies on in his 28-J letter at 236, I'm quoting now, we find that the practical or indirect financial effects of a judgment may enter a court's calculus, but rarely have significant bearing on a determination. So, they look at it. They don't usually find it to be relevant, as this court has a few times, but they do look at it. So, I think it is persuasive for that reason. The fact that the check is written by the Treasury, that's just a non-starter under this court's decision in Hoover. There, when the shoe was on the other foot, the party opposing arm of the state status said, look, court, the money would go into the state entity's own account, the Reserve and Control Board's own account, not the state's account. So, look, they're different. This court said, nonsense. You don't look at labels on bank accounts. You look at whose money it is, and in that case, the money was effectively the state's money because they could take it out. They supported the board. The money passed between the state and the entity in a way that it absolutely does not hear. So, the fact that the state Treasury's name is on the check is not the point. The point is, it is fee as money. It is admitted to be fee as money. It is earmarked as fee as money. It is fee as money by law. As to the second factor, just adding to what I said before, I think it's important to note that FEA controls its funds by law. Again, we won on this factor in the district court based on the district court's review of the facts and the fact that the most critical fact to this court's analysis in Oberg was confirmed in discovery. That is that FEA is financially independent. It runs all its operations without any appropriation from the state. As to the third factor, I would agree with Judge Keenan's observation. This is a massive commercial enterprise, and even if the commercial part isn't necessarily determinative, the fact that it is a massive commercial out-of-state enterprise is determinative of the third factor. These loans are being made to Georgia, Delaware, West Virginia, and others. Mr. Michael, I want to ask you a question about that. Yes, sir. So are you saying that if all four factors clearly, you kind of conceded on four, and those to Mr. Clement's side, but if all four clearly did, and they really were and still are clearly a massive enterprise of making billions of dollars, would that make a difference? I don't think the third factor alone would be dispositive. I mean, that's the reason it is a four-factor test. But it does weigh in our favor that as against their $75 million in grants that they give to Pennsylvania students, they're running a $100-plus billion loan servicing business all over the country. That's a state choice, isn't it? I mean, that's what states do. They decide how much. You know, sometimes states take money from tobacco and they bill roads. They're kind of interested in it. I don't know. But this Court has looked to not only the state's mission, but also the focus of its activities. And even the revenue it brings in, only a third of that revenue goes to its grant program. The other two-thirds go to its own coffers. So if I could conclude with this one observation, I see my time has expired. In Hess, the Supreme Court held that sovereign immunity was inappropriate where, and I'm quoting now from page 52, the entity was, quote, financially self-sufficient, it generates its own revenues, and it pays its own debts. That is exactly the case with FIA, and for that reason, this Court should reverse. Okay, thank you. Do you want to keep going, or do you want to keep going? Keep going. Thank you. We'll come down to Greek Council in one of the last days. Thank you.
judges: William B. Traxler, Jr., Roger L. Gregory, Barbara Milano Keenan